# EXHIBIT 1

EMI APRIL MUSIC INC./EMI BLACKWOOD MUSIC INC.
1290 Avenue of the Americas
New York, New York 10104

ART OF WAR MUSIC PUBLISHING, INC.                                    As of July 1, 2002
individually and d/b/a Urban Warfare (ASCAP)
and Street Warfare (BMI) and any and all Affiliates
c/o Mr. Burton Goldstein
Burton Goldstein and Associates
156 West 56th Street, Suite 1803
New York, NY 10016

Ladies and Gentlemen:

When signed by ART OF WAR MUSIC PUBLISHING, INC., individually and d/b/a Urban Warfare (ASCAP) and Street Warfare (BMI) and any and all Affiliates (individually and collectively, "you"), and by EMI April Music Inc. and EMI Blackwood Music Inc. (collectively, "Publisher"), this shall constitute an exclusive administration agreement ("Agreement") between you and Publisher on the following terms. During the Term of this Agreement, you shall Deliver to Publisher, for exclusive exploitation in accordance with this Agreement, all Compositions (as defined below). During the Term, Publisher will be the exclusive administrator of Your Interest in all Compositions throughout the Territory.

1. **Territory:** The Territory covered by this Agreement ("Territory") shall be the Universe.

2. **Term:** (a) The Term of this Agreement ("Term") shall commence as of the date of this Agreement and will continue until the later of: (i) three (3) years thereafter, or (ii) the end of the semi-annual accounting period during which Publisher has recouped, from royalties credited to your account hereunder, all Advances paid under this Agreement. At any time after the three-year anniversary of the Term ("Three-Year Date"), you may terminate the Term by paying Publisher 110% of the unrecouped balance of your royalty account hereunder. For a period of two years following the Term, Publisher will have the right to collect monies earned from exploitations of the Compositions made during the Term.

   (b) Notwithstanding the end of the Term, Publisher shall have the option, as described in paragraph 3(b) below, to acquire ongoing administration rights in "Post-Term Compositions" which are embodied on one or more "First Post-Term Albums," as such terms are defined below.

3. **Compositions Subject to this Agreement:** (a) "Compositions" shall mean (i) all musical compositions listed on Schedule A to this Agreement and (ii) all other musical compositions in which an interest was or is acquired by you prior to and/or during the Term pursuant to the "Writer Agreements" (as defined below). "Your Interest" in a Composition shall mean that percentage interest in a Composition resulting from your ownership and/or control of rights in that Composition (inclusive of the so-called "writer's share"). You shall Deliver to Publisher Your Interest in each Composition promptly following your acquisition of rights therein, except that those Compositions for which Your Interest was acquired prior to the Term shall be Delivered simultaneously with execution hereof. You represent and warrant that Your Interest in such Compositions is specified on Schedule A. Songwriters of Compositions (and any other Persons with whom you have entered into agreements with respect to musical compositions) shall be referred to herein as "Writers," and your agreements with the Writers shall be referred to herein as "Writer Agreements; provided, however, that for purposes of this Agreement a "Writer Agreement" shall not include an agreement with a new Writer (i.e. a Writer with whom you have not previously entered into a publishing agreement) entered into after the date hereof ("New Writer Agreement"). You represent and warrant that all Writer Agreements are listed and described on Exhibit C to this Agreement. The inadvertent omission from Schedule A or Exhibit C of any Composition or Writer Agreement (respectively) shall not be deemed to affect Publisher's rights with respect thereto. You acknowledge that "Compositions" hereunder shall include, without limitation, all musical compositions written by Writers which are embodied on upcoming Albums by Mya, Dru Hill, Sisqo, Jazz, Woody Rock and Prophet Jones.

   (b) <u>Post-Term Compositions.</u> As used in this Agreement, the "First Post-Term Album" under a Writer Agreement shall mean the first new studio Album by such Writer to be released after expiration of the Term under paragraph 2(a) above. Notwithstanding the expiration of the Term, with respect to each Writer, Publisher shall have the option to acquire ongoing administration rights in musical compositions which are (i) owned and/or controlled by you pursuant to such Writer's Writer

Agreement and (ii) embodied on the First Post-Term Album by such Writer ("Post-Term Compositions"). Publisher shall exercise each such option by sending you written notice not later than 10 days following the U.S. release date of the First Post-Term Album concerned, provided that such notice is accompanied by payment of 100% of the "Writer Advance" (as defined below) payable under the Writer Agreement in connection with the Post-Term Compositions embodied on such First Post-Term Album and provided, further, that if payment of the Writer Advance is required to be made sooner than 10 days following the U.S. release date of the First Post-Term Album concerned, then such notice and payment shall be sent not later than the required payment date. (If the Writer Advance is not capable of calculation due to missing "splits," sampling issues, your failure to provide information to Publisher, etc., then Publisher's notice to you of its option exercise is not required to include payment of the Writer Advance, provided that Publisher shall be responsible for paying such Writer Advance when such Writer Advance is capable of calculation by Publisher and otherwise payable under the Writer Agreement.) If Publisher exercises its option with respect to particular Post-Term Compositions, then notwithstanding termination of the Term, Publisher shall retain all rights described in this Agreement (e.g. exclusive administration rights, rights to retain the Administration Fee described in paragraph 7(a) below, etc.) with respect to such Post-Term Compositions, except that such rights shall continue for the full term and retention period described in the applicable Writer Agreement, notwithstanding anything to the contrary contained in this Agreement. Further, Publisher shall enjoy, with respect to such Post-Term Compositions only, any collection rights described in the applicable Writer Agreement following the end of the retention period applicable thereto. Publisher shall have as many options under this paragraph 3(b) as there are First Post-Term Albums. You shall cooperate with Publisher in all material respects with respect to Publisher's exercise of its rights under this paragraph 3(b), even though the Term of this Agreement has otherwise expired. For avoidance of doubt, a Writer Advance shall be recoupable from the Writer's share of royalties as provided in the applicable Writer Agreement, but shall not be recoupable from your share of Net Income (which will be credited to your account as described below).

4. **Grant of Exclusive Administration Rights:** (a) With respect to Your Interest in the Compositions, you hereby grant to Publisher and its licensees the sole and exclusive right and license during the Term, throughout the Universe, subject to those restrictions set forth in paragraphs 4(b) and (c), to: license the exploitation of the Compositions in all forms, media, technologies and configurations (whether now known or hereafter developed), including without limitation for use in Records, motion pictures and other audio-visual works, so-called "sample" uses, Internet uses of all kinds, advertisements, and merchandising; print, publish, rent and/or sell printed editions and other reproductions of the Compositions, in any forms, media or configurations; present or future; collect all monies whatsoever derived from exploitation of the Compositions, whenever earned (subject to the collection rights of Warner/Chappell during the "Warner Collection Period" as described in paragraph 4(e) below); license public performance rights; make arrangements, adaptations and other changes; settle all disputes concerning "writer splits" and "publisher splits" and otherwise resolve any and all outstanding "split" issues (including as a result of so-called "samples"); and otherwise administer and grant rights in, and with respect to, the Compositions to the fullest extent possible. In connection with the foregoing, you hereby appoint Publisher your true and lawful attorney to: secure and renew copyrights; subject to your consent, initiate and compromise claims against infringers of rights in the Compositions; and execute in your names and the names of the Writers any and all documents reasonably necessary or desirable to accomplish the foregoing and/or effectuate Publisher's rights hereunder, including without limitation, documents agreeing to so-called "writer splits" and "publisher splits" in the event such information is not provided by you with respect to a specific Composition or Compositions. You also grant to Publisher rights to use your name, names, likenesses and biographies of Writers, and names, likenesses and biographies of Haaq Islam ("Haaq"), which rights shall be exclusive solely with respect to music publishing activities covered by this Agreement; you shall have the right (not to be unreasonably withheld) to approve likenesses of Writers and Haaq and biographies of Writers and Haaq so used by Publisher. You will promptly execute all additional documents reasonably required by Publisher in connection with this Agreement, including the Exhibits annexed hereto. Publisher shall have the right to add to Schedule A titles of, and information relating to, Compositions as they are Delivered. Publisher may circulate Exhibits, with Schedule A attached, to appropriate parties e.g. performing rights societies). If you do not consent to the initiation and/or compromise of a claim against an infringer of rights in a Composition, then Publisher can initiate and/or compromise such claim in its name only (as administrator) at its sole expense, and can retain for its own account the proceeds of any settlement or judgment.

(b) Notwithstanding anything to the contrary contained in this Agreement, during the Term, Publisher shall not, without your prior written consent, license the use of the Compositions in connection with the following:

(i) any commercials, endorsements, advertisements or premiums;
(ii) any theatrical motion pictures or television uses (including cable television);
(iii) merchandising rights;
(iv) the use of the title of any Composition (without the music and/or lyrics of that Composition) for any play, motion picture or television program;
(v) videogames; and
(vi) so-called "sample" uses, provided that Publisher will not be in breach hereunder if a Composition was actually "sampled" prior to Publisher's receipt of a request for consent for the use of such Composition in the "sample" concerned.

Your consent for any of the above uses shall not be unreasonably withheld and will be deemed given unless Publisher has received your rejection of such proposed use within seven (7) days following Publisher's request, which, for purposes of this paragraph 4(b) may be faxed to you at Burton Goldstein & Co., LLC, with a copy to Burton Goldstein, and will be deemed received on the date of faxing.

(c) During the Term, Publisher will not make material changes in the music, lyrics or essential structure of the Compositions without your consent. Your consent shall not be required for foreign language changes, gender changes, and other customary non-material changes.

(d) For avoidance of doubt, in no event will this Agreement be construed to assign to Publisher any copyright ownership in the Compositions, it being the intent of the parties that Publisher only acquire exclusive administration and exploitation rights in the Compositions, subject to the terms of this Agreement.

(e) Prior Warner Deal. You have advised Publisher that your prior music publishing administrator was Warner/Chappell Music Publishing ("Warner/Chappell") and that your administration agreement with Warner/Chappell ("Warner Deal") terminated as of December 31, 2001. However, you have also advised Publisher that the Warner Deal provides that Warner/Chappell has the right to collect monies earned from exploitation of the Compositions during the term of the Warner Deal for a period (the "Warner Collection Period") of one year. Neither you nor Publisher shall be in breach of this Agreement in the event Publisher fails to collect monies properly collected by Warner/Chappel under the Warner Deal during the Warner Collection Period.

(f) Undercover Brother Sync License. You have advised Publisher that, prior to the date hereof, you licensed the Composition titled THE THONG SONG for use in the film Undercover Brother, for a synchronization fee that has not been collected by you as of the date hereof (the "Fee"). You acknowledge and agree that Publisher shall have the sole right to collect the Fee, deduct and retain its Administration Fee out of the Fee, and credit the applicable share to the Writer account. However, your share of Net Income shall not be applied toward recoupment of Advances hereunder but shall instead be paid out to you promptly following receipt of the Fee by Publisher. You shall, promptly following execution hereof, provide Publisher with a copy of the synchronization license to enable Publisher to exercise its rights hereunder.

5. Writers and Writer Agreements:

(a) You represent and warrant that:

(i) You are now, and shall at all times remain, a party to Writer Agreements in full force and good standing with the Writers pursuant to which the Writers grant to you, and you are the owner of all rights, interests, benefits and entitlements necessary for you to fulfill all of your obligations to Publisher under this Agreement;

(ii) The Writer Agreements contain or will contain royalty provisions which are not inconsistent with the terms of this Agreement;

(iii) Prior to the date hereof, you (or your prior administrator Warner/Chappell) have rendered all necessary royalty accountings and payments to the Writers in accordance with the Writer Agreements; and you are not otherwise (and will not during the Term become) in breach of any Writer Agreements; and

(iv) No Writer Agreements prohibit you from granting to Publisher the rights granted under this Agreement.

(b) Publisher agrees that, at a time and in a manner consistent with Publisher's customary accounting procedures and subject to these terms, Publisher shall, on your behalf, account to and pay to all Writers all royalties actually payable to the Writers during the Term, pursuant to the Writer Agreements, out of Gross Income collected by Publisher hereunder. In no event will any Writer royalties reduce or affect Publisher's Administration Fee. Prior to or simultaneously with the execution of this Agreement, you shall provide to Publisher complete copies of all Writer Agreements, complete and accurate contract administration information with respect to Writer Agreements (e.g. status of deals), accurate information as to Writer royalty accounts (e.g. balances, addresses), complete and accurate information as to Compositions including Writer and publisher "splits" and any other information reasonably requested by Publisher in connection with this Agreement and Publisher's administration rights and obligations (collectively "Writer Information"). It is a condition precedent to the effectiveness of this Agreement that Publisher have had an opportunity to review all Writer Information in order to reasonably satisfy Publisher that it is acquiring all rights contemplated by these terms. Except as expressly set forth in this Agreement, Publisher shall have no obligations or liabilities whatsoever with respect to Writers and Writer Agreements and you hereby indemnify Publisher from and against any claims by the Writers, and/or with respect to the Writer Agreements. Without limitation of the foregoing, Publisher shall not be required to pay any advances to Writers under the Writer Agreements "Writer Advances", except as described in paragraph 3(b) above, or be responsible for any so-called "contract administration" with respect to Writer Agreements (e.g. exercise of options). Further, Publisher agrees not to pay any Writer Advances without your approval, except as otherwise described in paragraph 3(b) above. The Writers shall not be third-party beneficiaries under this Agreement or enjoy any rights as against Publisher. You shall protect, implement and enforce all of your rights under the Writer Agreements unless Publisher agrees otherwise in writing. You will not, without Publisher's consent, modify any Writer Agreement during the Term in any way which would affect Publisher's rights acquired hereunder (except that you shall timely exercise options under the Writer Agreements in order to acquire rights in applicable Compositions and Post-Term Compositions). Publisher shall have the right to do any act or thing, in your name and on your behalf, which you could do yourself under any Writer Agreement or for the purpose of protecting, implementing or enforcing your rights thereunder, if you do not do so within a reasonable time following Publisher's request. If you default on any of your obligations under any Writer Agreement, Publisher may elect to cure the default on your behalf; in such event, any monies paid by Publisher in order to cure a default shall be chargeable against and deductible from any monies otherwise accruing to your credit under this Agreement and/or shall be reimbursed by you to Publisher promptly following Publisher's request.

(c) During the Term, Publisher agrees to issue mechanical licenses for the use of Your Interest in Compositions in Phonograph Records in accordance with the so-called "controlled composition provisions" of any recording agreements entered into by Writers prior to the date hereof; provided that (i) you supply to Publisher complete and accurate copies of such "controlled compositions provisions simultaneously with the execution of this Agreement and (ii) in no event will any such "controlled composition provisions" provide for a top-line mechanical royalty rate of less than ¾ of the U.S. minimum statutory rate, or an album "cap" less than 10. In no event will Publisher be deemed in breach of this Agreement for failure to issue a mechanical license in accordance with a "controlled composition provision" of which you have not provided Publisher with a copy in a timely manner, or which does not fulfil the preceding requirements. With respect to recording agreements to be entered into by Writers during the Term, you shall provide to Publisher drafts of all "controlled composition provisions" for Publisher's reasonable review and comment, and Publisher shall have the right to approve the final version of such provisions (such approval not to be unreasonably withheld); however, Publisher achnowledges that the mechanical royalty rate and cap specified in clause (ii) of this paragraph 5(c) are acceptable. Following such approval, Publisher will issue mechanical licenses for the use of Your Interest in applicable Compositions in Phonograph Records in accordance with such approved "controlled composition provisions."

6. **Advances:** An Advance is a prepayment of royalties under this Agreement. All Advances are fully recoupable by Publisher from all royalties credited to your royalty account at any time. (For avoidance of doubt, Advances hereunder are not recoupable from royalties accruing to the credit of the Writers pursuant to the Writer Agreements.) During the Term, Publisher will pay you the following Advances:

(a) $ ▮▮▮▮ payable promptly following execution of the Agreement.

(b) If, as of the end of any semi-annual accounting period during the Term, your account hereunder is in a fully-recouped position (as reflected on the royalty statement rendered to you for such period) then you shall have the right to require Publisher to pay you an additional Advance ("Rollover Advance") equal to $ ▮▮▮▮, provided, however that:

(i) in no event will Publisher be required to pay you more than two Rollover Advances during the Term (i.e. a maximum of $█████ in Rollover Advances); and

(ii) in no event will the Term end prior to recoupment of all such Rollover Advances as well as any other Advance(s) (subject to your right, after the Three-Year Date, to terminate the Term by paying Publisher █% of your unrecouped balance pursuant to the last sentence of paragraph 2 above). .

If Publisher makes any overpayment to you in connection with an Advance, Publisher shall have the option to require you to reimburse Publisher the amount of the overpayment and/or deduct the amount of overpayment from any amounts otherwise payable to you under this Agreement.

7. **Royalties:** (a) Publisher will be entitled to receive and retain for its own account an administration fee (the "Administration Fee") in an amount equal to: (i) █% of "Gross Income" (as hereinafter defined) derived from synchronization uses of Compositions secured by Publisher and Cover Recordings secured by Publisher and (ii) █% of Gross Income from all other exploitations of the Compositions. Publisher will credit to your account █% of "Net Income" (as hereinafter defined).

(b) (i) "Gross Income" means all monies earned, and actually received, by Publisher in the U.S., in connection with Your Interest in the Compositions. With respect to monies earned outside of the U.S., "Gross Income" shall be calculated "at source," i.e. shall include any share of such monies relating to Your Interest in the Compositions that is received by Publisher's subpublisher; provided that in the Baltic States, Colombia, Croatia and Slovenia, Indonesia, Israel, Paraguay, Peru, Russia, Turkey, Uruguay, Venezuela, Guatemala, Costa Rica, Philippines, Thailand and China, the Compositions shall be sub-published by Publisher's subpublisher; such subpublisher may retain up to 30% of all income received by that subpublisher; and the balance of income received by Publisher in the United States shall be "Gross Income".

(ii) "Net Income" means Gross Income less the following amounts: the Administration Fee, actually-incurred costs of collecting income, copyright registration fees, fees paid to or charged by a trustee or collecting agent (or an equivalent amount to be retained by Publisher if Publisher undertakes to perform their functions, not to exceed the like fee charged by the Harry Fox Agency), legal fees, all other reasonable out-of-pocket expenses related directly to the Compositions and their exploitation hereunder, and all royalties accruing to the credit of the Writers in accordance with the Writer Agreements and any other amounts paid by Publisher in connection with the Writer Agreements.

8. **Royalty Accountings To You:** Publisher will charge all Advances, and credit your share of royalties, to a single royalty account. Publisher will calculate royalties semi-annually, and will render accountings to you not later than 90 days following the end of each June 30 and December 31 for the prior six months. Along with such accountings, Publisher will pay you any net royalties that are due after deducting unrecouped Advances. If Publisher makes any overpayments, Publisher may (without limitation of its other rights) deduct them from future royalty payments. Foreign royalties will be paid by Publisher's Licensees to Publisher, and subsequently be accounted to you, in accordance with the standard practices of Publisher and its Licensees. If Publisher's Licensee deducts taxes from its payments to Publisher, or any law, government ruling or other restriction affects royalty payments to Publisher, then Publisher may deduct a proportionate amount from your royalties. However, if after a final IRS audit (or after such an audit is time-barred), Publisher is allowed a tax credit in connection with such foreign withholdings, then Publisher will credit your account with your proportionate share thereof. (Publisher's determination of such share will be conclusive and not subject to review by you or your accountant). You may, at your sole expense, appoint a certified public accountant to examine Publisher's books and records concerning exploitations of Compositions ("Examination"). If you wish your accountant to conduct an Examination, you shall send Publisher written notice of your intention to do so. Your accountant may conduct an Examination only to verify the accuracy of accounting statements sent to you and may not examine records that do not specifically report exploitations of Compositions. Your accountant may make an examination for a particular statement only once, and only within three years after the date Publisher sends you the statement. An Examination must be conducted at Publisher's royalty offices, during usual business hours, and subject to Publisher's scheduling constraints. All "fieldwork" for an Examination must be completed within 45 days (unless any delay is solely caused by Publisher, provided, that Publisher's unwillingness to furnish your accountant materials not commonly furnished by Publisher in examinations shall not be deemed a "delay" hereunder); or else such "fieldwork" may be terminated by Publisher on seven days' notice to your accountant. Your accountant may not commence an Examination if he has